**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Orville BAKER, Roy Wireman, Skid Ronnie Manns, and Ellis Manns, Defendants–Appellants.**

Nos. 88–3216, 88–3358, 88–3409 and 88–3425.

United States Court of Appeals, Seventh Circuit.

Argued March 2, 1990.

Decided June 26, 1990.

Andrew B. Baker, Jr., Asst. U.S. Atty., Hammond, Ind., Rick L. Jancha, William Grimmer, Asst. U.S. Attys., South Bend, Ind., Shannan Hough, Law Student, for U.S.

Julie L. Friedman, Chicago, Ill., for Orville Baker.

Bruce H. Bornstein, Chicago, Ill., for Roy Wireman.

Suzanne Philbrick, Oak Lawn, Ill., for Skid R. Manns.

David Vandercoy, Valparaiso University, School of Law, Valparaiso, Ind., for Ellis Manns.

Before CUMMINGS, POSNER, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Ellis Manns and Wayne Stone managed a junior varsity marijuana network. They harvested marijuana growing wild in Iowa and Nebraska—"weed" in more senses than one. Called "ditch weed" in this record, it was gathered by the thousands of pounds. Ditch weed is so low in quality that it sold for only $30 to $40 per pound, and to make it worthwhile to deliver at any distance Manns and Stone had to stuff automobiles to the brim.

The indictment charged 27 persons, and the defendants were tried in five groups. Our group includes Ellis Manns, his brother Skid Ronnie Manns, Orville Baker, and Roy Wireman. They were tried with Scottie Manns (another brother), Larry Geesa, and Ronald Huff; Weddie Manns, Ellis's son, was included in the group but pleaded guilty before trial. The jury acquitted Geesa and Huff; Scottie Manns was convicted but has not appealed. The jury convicted Ellis Manns of conspiracy to possess marijuana with intent to distribute it, interstate travel in aid of racketeering, possession of more than 100 kilograms of marijuana with intent to distribute it, possession of more than 50 kilograms of marijuana (on a different occasion) with intent to distribute it, and being the kingpin of a continuing criminal enterprise, in violation of 21 U.S.C. § 848. It acquitted Ellis of 30 other charges. The CCE conviction is responsible for the sentence of 18 years' imprisonment without possibility of parole. The jury convicted Skid Ronnie Manns of conspiracy to possess marijuana with intent to distribute it, five counts of possessing marijuana with intent to distribute (one under 50 kilograms, one over 50 but less than 100, and three over 100 kilograms), and five counts of interstate travel in aid of racketeering. He was acquitted on four counts. His sentence was 12 years. Wireman was found guilty of all three charges laid against him: conspiracy, possession of more than 50 kilograms of marijuana with intent to distribute, and of abetting interstate travel in aid of racketeering. He was sentenced to 14 years in prison. Baker was convicted of a single count of possessing more than 50 kilograms of marijuana with intent to distribute it and was acquitted on two charges. He drew 11 years. The similarity of the sentences stands in marked contrast to the substantially different gravity of the charges on which the four were convicted, but this case is not governed by the Sentencing Guidelines.

I

■ Ellis Manns contests his conviction under the CCE statute. One of the elements of the CCE offense is that the defendant supervise five or more others in "a continuing series of violations" of the drug statutes. Courts commonly define "series"

as three or more offenses; the jury instructions in this case did so. The jury convicted Ellis Manns of exactly three drug offenses: conspiracy to distribute marijuana and two possession offenses. It may of course have believed that he committed many other crimes; it is not limited to those charged in the indictment. *United States v. Markowski*, 772 F.2d 358, 361–62 (7th Cir.1985); *United States v. Aiello*, 864 F.2d 257, 265 (2d Cir.1988). The difficulty arises because of an instruction that a conspiracy counts as a predicate offense. So the jury may have convicted Ellis Manns as a kingpin on finding that he possessed marijuana twice and joined the conspiracy to distribute it. If a conspiracy is not a proper predicate offense, and if three is the minimum, the conviction may not stand.

Seven courts of appeals have held that a drug conspiracy may be counted toward the three. *United States v. Middleton*, 673 F.2d 31, 33 (1st Cir.1982); *United States v. Young*, 745 F.2d 733, 750–52 (2d Cir.1984); *United States v. Fernandez*, 822 F.2d 382, 384–85 (3d Cir.1987); *United States v. Ricks*, 802 F.2d 731, 737 (4th Cir.1986) (in banc); *United States v. Schuster*, 769 F.2d 337, 345 (6th Cir.1985); *United States v. Hall*, 843 F.2d 408, 410–11 (10th Cir.1988); *United States v. Brantley*, 733 F.2d 1429, 1436 n. 14 (11th Cir.1984). None forbids use of a drug conspiracy. *Young*, the leading case, relies on the language of § 848(c)(2), which speaks of a "continuing series of violations of this subchapter or subchapter II of this chapter". Section 846, which defines the drug conspiracy offense, is part of "this subchapter". QED. Our court initially forbade use of the conspiracy as a predicate offense, *United States v. Jefferson*, 714 F.2d 689, 702 n. 27 (7th Cir.1983), but more recently deemed the question open, *United States v. Bond*, 847 F.2d 1233, 1238 n. 1 (7th Cir.1988); *United States v. Moya–Gomez*, 860 F.2d 706, 750 n. 38 (7th Cir.1988), in large part because the Supreme Court vacated *Jefferson*, 474 U.S. 806, 106 S.Ct. 41, 88 L.Ed.2d 34 (1985). The time has come to resolve it.

The difficulty with using the "plain language" of § 848(c)(2) as the foundation for the proposition that a drug conspiracy is a predicate offense comes from § 848(c)(2)(A), which requires the prosecution to establish that the "series of violations" were "undertaken ... in concert with five or more other persons". An in-concert requirement means a conspiracy, and for this reason the Supreme Court held in *Jeffers v. United States*, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977), that the conspiracy defined by § 846 is a lesser included offense of the crime defined by § 848. See also *Garrett v. United States*, 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985); *United States v. Pace*, 898 F.2d 1218, 1236–38 (7th Cir.1990). To treat a conspiracy as one of the "series of violations" to which § 848(c)(2) refers is to say that it is a crime to commit a conspiracy in concert with other people, which is redundant. What sense would it make to allow the prosecution to count a conspiracy toward the three predicate offenses when the prosecutor must prove conspiracy anyway to satisfy § 848(c)(2)(A)? Maybe a conspiracy *other* than the concert with five persons to which § 848(c)(2)(A) refers would be a logical predicate, but how could such a conspiracy be part of the "continuing series" involving the five essential persons? A conspiracy is part of the essential "continuing series" only if it involves a concert among the kingpin and five subordinates—in which event it becomes a lesser included offense, and it is double counting to include it among the three predicates.

Incongruous results are not necessarily sufficient reason for rejecting a straightforward statute. So perhaps we should take the language at face value even though one conspiracy then counts toward both the "continuing series" and the "in-concert" requirements. Whether to do this depends in large measure on the meaning of the "series" requirement.

Treating a conspiracy—a crime that *always* exists when the prosecutor establishes the "concert" with five or more others—as a predicate whittles the "series" down to a minimum of two substantive crimes. Did Congress authorize a CCE conviction when the "series" may have no more than two

substantive offenses? The legislative history does not help; it is silent on the meaning of "continuing series of violations". We know from the debates only that the statute is "a carefully crafted prohibition aimed at a special problem. [It] is designed to reach the 'top brass' in the drug rings, not the lieutenants and foot soldiers". *Garrett*, 471 U.S. at 781, 105 S.Ct. at 2413. Congress took a bead on the brass through the five-supervised-persons requirement in § 848(c)(2)(A) and the substantial-income requirement of § 848(c)(2)(B). The difference between two and three predicate offenses does not mark the line between top brass and foot soldiers.

Where, then, does the equation between "continuing series of violations" and three or more crimes come from? Other compound offenses, principally the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961–68, require two or more offenses. RICO depends on a "pattern" of racketeering, which means "at least two acts of racketeering activity", 18 U.S.C. § 1961(5), characterized by "continuity plus relationship". *H.J. Inc. v. Northwestern Bell Telephone Co.*, —— U.S. ——, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989). RICO itself specifies that it takes two to make a pattern; what says that it takes three to make a series?

Not Congress. The statute and its history are silent. Although many courts use three, the source of this requirement appears to be not the statute but the dictionary. The case cited most frequently for the equation between "series" and "three" is *United States v. Valenzuela*, 596 F.2d 1361, 1364–65 (9th Cir.1979), which neither discusses the subject nor cites any authority. A survey of the few opinions that cite other cases leads to *United States v. Collier*, 358 F.Supp. 1351 (E.D.Mich.1973), as the genesis. *Collier* does not rely on either the debates in Congress or the function of the series requirement. It relies on Webster's and *Tarsia v. Nick's Laundry & Linen Supply Co.*, 239 Or. 562, 399 P.2d 28 (1965), which interprets the word "series" in an Oregon law. *Tarsia* obtained "three" from another dictionary.

We have nothing against dictionaries, but they are guides to how some persons used words in the past rather than solid evidence about how Congress used words on a particular occasion. *Country Mutual Insurance Co. v. American Farm Bureau Federation*, 876 F.2d 599, 600 (7th Cir. 1989). The Oxford English Dictionary, the weightiest of them all, defines series as "[a] number of things of one kind (chiefly immaterial, as events, actions, conditions, periods of time), following one another in temporal succession, or in the order of discourse or reasoning." The editors give 16 other definitions (e.g., "In the Indogermanic languages, a set of vowels, or of diphthongs and vowels or sonants, which are mutually related by ablaut"), with scads of etymological examples. Not a one of them mentions "three". Comparing "series" with "pattern" also does not produce the difference between three and two. "Series" sounds like a line (which two points may define), while "pattern" is more like a plane, which needs at least three points for a definition—if Congress had geometry on its collective mind.

We can't fathom why two may make a RICO pattern but three are essential to a CCE series. Courts that allow the inevitable conspiracy to be used as a predicate offense effectively hold that two is the minimum for a series. Telling a jury that three is the minimum and that a conspiracy counts as one creates a potential for confusion without any possibility of benefit. Because the § 846 conspiracy is a lesser included offense of the "concert" aspect of § 848(c)(2)(A), we use Occam's Razor to slice away both the conspiracy and the third predicate offense. Judges should tell juries that a series may be established by *two* or more *substantive* drug offenses, and that a conspiracy does not count toward this minimum. The lesser included conspiracy does not count for reasons we have explained; an unrelated conspiracy does not count because it cannot be part of the "continuing" series with the five subordinates; thus no inchoate offense should be included in the "series" to which § 848(c)(2) refers.

This brings us into harmony in result, although not in exposition, with the seven other circuits that set a minimum of three violations and allow the included conspiracy to serve as one. It also means that Ellis Manns' conviction for the CCE crime stands. The jury convicted him of two drug offenses and found the necessary concert of action, supervision, and substantial income ingredients. Although the instructions made the task needlessly complex by requiring a minimum of three but allowing the conspiracy to count, this did not work to Ellis's detriment.

## II

Congress' decision to establish minimum penalties dependent on the quantity of marijuana, without regard to its quality, is the principal argument Skid Ronnie Manns presses on appeal. Section 841(b)(1)(B)(vii), for example, sets a five-year minimum when the crime involves "100 kilograms or more of a mixture containing a detectable amount of marijuana, or 100 or more marijuana plants regardless of weight". The five years increase to ten if the defendant has a prior conviction. Skid Manns emphasizes that although the ditch weed he gathered and sold had a "detectable amount of marijuana", it did not have much more than that. (It had enough active ingredient to justify calling it "marijuana", however.) He contends that it is irrational to impose a minimum five or ten year term on someone who sells 100 kilograms of such innocuous stuff, while someone who distributes 99 kilograms of potent marijuana from Hawaii faces no minimum sentence under § 841(b)(1)(C).

So far as we can tell, the mandatory minimums do not affect the district judge's sentences. Skid Manns, convicted of 11 felonies, could have been sentenced to more than 100 years in prison, without parole, even if the minimums were not there; he received only 12. It is accordingly unnecessary to decide whether Congress must take potency into account when setting statutory minima.

## III

Orville Baker and Roy Wireman contest the sufficiency of the evidence against them.

**A.** The evidence concerning Baker, taken with reasonable inferences in the light most favorable to the verdict, shows that in January 1987 Stone and Ellis Manns delivered 200 pounds of "shake"—marijuana seeds plus broken stems and leaves—to a customer in Florida. The customer did not like the quality of this mixture and accepted only 75 pounds. Stone then called Baker, an acquaintance of six years, and asked whether he could do anything with 125 pounds of shake. Baker replied that he would try. Stone, Skid Manns, and a third person delivered the shake to Baker's house in Kentucky. Stone quoted a price of $50 per pound, but Baker paid only $1,000 for the load. When arrested, Baker still had the shake. On this evidence, the jury convicted him of possessing more than 50 kilograms of marijuana with intent to distribute it.

Evidence allows the jury to conclude both that the substance was marijuana (although barely) and that it weighed more than 50 kilograms (although barely). Baker contends that the shake was worthless and could not have been distributed. If so, he may be convicted of no more than simple possession. The difficulty with the claim that the shake was "worthless" is that Baker paid at least $1,000 for it (and may have promised to pay more if he could resell). Baker paid $8 per pound in cash. That's more than the price of sugar or flour, which no one would call worthless or unsalable. Insistence that shake is worthless *for smoking* tends to show, moreover, that it must have been held for distribution. Shake may be used to dilute more potent marijuana. Baker could not have smoked 125 pounds of shake during a lifetime. Only the supposition that he would redistribute the stuff makes sense of the deal. The evidence is sufficient—and the large quantity in relation to the potential for personal consumption shows why none of the defendants was entitled to an instruc-

tion on the lesser included offense of simple possession.

**B.** Wireman was convicted of possession with intent to distribute, of abetting interstate travel in aid of racketeering, and of conspiracy. All three convictions grow out of a single load of 200 pounds delivered to Wireman in Florida. (Hence the conviction for abetting the interstate travel of the couriers who ferried the drug to him by car from Indiana.) Wireman promised to pay $40 per pound. He did not pay on delivery. Later he told Stone that he had lost the marijuana and would replace it by picking and delivering 200 pounds. (How do you "lose" 200 pounds of marijuana?) Nothing in the record suggests that he kept that promise.

▆▆▆ The conviction under the Travel Act, 18 U.S.C. § 1952(a)(3), is beyond substantial challenge. Wireman arranged for a shipment of marijuana from Indiana to Florida. The conviction of possession with intent to distribute is only slightly more problematic. The substantial quantity of the load and the poor quality of ditch weed support an inference that Wireman planned to distribute the drug as a filler for other marijuana rather than to consume it all himself. But the conviction of conspiracy is exceedingly difficult to sustain.

▆▆▆ Wireman bought one load of marijuana from a conspiracy that, according to the indictment, lasted from 1984 to 1987. Wireman lived in Florida; the principal operators lived in Indiana and gathered their product elsewhere in the midwest. Nothing in the record suggests that Wireman had more than this one transaction with the conspiracy. A buyer does not automatically become a member of the conspiracy. *United States v. Douglas*, 818 F.2d 1317, 1321 (7th Cir.1987); *United States v. Marks*, 816 F.2d 1207, 1212 (7th Cir.1987). The prosecution must establish by substantial evidence, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), that the defendant knew the existence and scope of the conspiracy and sought to promote its success. *United States v. Herrera*, 757 F.2d 144, 149 (7th Cir.1985). Even a large purchase does not

demonstrate these things, *United States v. Sperling*, 506 F.2d 1323, 1329 n. 5, 1342 (2d Cir.1974), any more than a purchase of 100 tons of steel to build a skyscraper shows that the buyer has "joined" the corporate enterprise of the manufacturer. *United States v. Mancillas*, 580 F.2d 1301, 1307 (7th Cir.1978); *United States v. Koenig*, 856 F.2d 843, 854 (7th Cir.1988).

Two features potentially distinguish Wireman's activities from those of a one-time purchaser. First, Wireman bought on credit, which may support an inference that he became a co-venturer by a profit-sharing arrangement. Second, Wireman promised to pay for his load by supplying more marijuana to the conspirators, implying a longer-term, reciprocal relationship. Features of this kind sometimes supply the essential substantial evidence of membership ("substantial", not "slight", see *United States v. Durrive*, 902 F.2d 1221, 1225–1230 (7th Cir. 1990)). See *United States v. Douglas*, 874 F.2d 1145, 1152 (7th Cir.1989); *United States v. Hyman*, 741 F.2d 906, 914 (7th Cir.1984); *United States v. Garcia–Rosa*, 876 F.2d 209, 223 (1st Cir.1989). But cases that allow these inferences also involve repeat purchases or some other enduring arrangement that implies knowledge of the scope of the conspiracy. Knowledge is missing here. Conspiracy is an *agreement*, and it is hard to see the basis for inferring that Wireman agreed to something the scope of which he could not have appreciated.

Credit and an offer to pay in kind are weaker here than in many other cases. The record does not support the conclusion that Stone and Wireman agreed to a credit sale and profit-sharing arrangement so much as it implies that Wireman stiffed the couriers and unilaterally changed the deal from cash to credit. Although he later promised restitution in kind, this too was unilateral. Stone wanted money, not marijuana. Stone and associates also wanted to make a profit. Delivery of 200 pounds of marijuana at an uncertain future time would leave the conspiracy at risk in the interim, and without a profit even if Wireman should come through. Even taking

the evidence in the light most favorable to the government, what emerges is that Wireman was trying to rip off the conspirators, not to join them. It is hardly surprising that Stone made no further deliveries. Substantial evidence does not support the conclusion that Wireman joined the Stone–Manns conspiracy. He was a buyer, no more.

Defendants raise a passel of other arguments, none of which requires discussion. Wireman's conspiracy conviction is reversed. His remaining sentences are vacated, and his case is remanded for resentencing. The convictions of Ellis Manns, Skid Ronnie Manns, and Orville Baker are affirmed.