**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Lee Andrew EDWARDS, Defendant– Appellant.**

**No. 94–3307.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 8, 1995.

Decided Feb. 27, 1996.

Andrew B. Baker, Jr., argued, Office of the United States Attorney, Dyer, IN, for Plaintiff–Appellee.

Kenneth P. Tableman, argued, Kenneth P. Tableman, P.C., Lansing, MI, for Defendant–Appellant.

Before BAUER, COFFEY and EVANS, Circuit Judges.

COFFEY, Circuit Judge.

Lee Edwards appeals his conviction and sentence for engaging in a continuing criminal enterprise, conspiring to distribute narcotics, distributing narcotics, using a communication facility to facilitate drug trafficking, and using a firearm during and in relation to a narcotics offense. We affirm.

## I. Background

Lee Edwards operated a drug ring from his two residences, 460 Taft Place and 1522 Taft Street, in Gary, Indiana and from the liquor store he owned in Gary, the "Black Horseman." The investigation of Edwards included wiretaps, surveillance, and controlled drug buys, and culminated in a search of Edwards's residence.

A cooperating individual, Walter Pettigrew, received money from federal agents and purchased heroin and cocaine from Edwards on six different occasions, beginning in March 1990. In the summer of 1990, Edwards's brother, Jimmie Edwards, began cooperating with the Federal Bureau of Investigation (the "FBI") and in August, based upon Jimmy Edwards's information, FBI agents obtained a court order for a wiretap on the telephones at Edwards's two residences in Gary, Indiana.

On October 11, 1990 federal agents of the Drug Enforcement Agency ("DEA") executed a search warrant at 460 Taft Place, Gary, Indiana. After knocking on the front door, identifying themselves, and receiving no reply from within, the agents entered the house. Within seconds of entering, the agents encountered gunfire: three shots were fired at them through the door of the master bedroom on the first floor. In response to directions from the agents, the defendant Lee Edwards and his wife Lorri Edwards, the only two individuals in the master bedroom, surrendered and was arrested. Agents found a recently-fired .357

Colt revolver on the floor of the bedroom at Lee Edwards's feet and a plastic bag containing a white substance in his pajama pocket, later determined to be cocaine.

The agents searched the residence and recovered a triple-beam scale, as well as other drug paraphernalia, including a grinder, clear plastic bags, wrappers, and envelopes. The agents also discovered a number of containers with a white powdered substance inside, as well as others containing a brown powdered substance, $6,120 cash in a purse and $5,300 hidden in a bedpost in the master bedroom. Lorri Edwards, the defendant's wife, later testified that the agents had missed $20,000 cash hidden in the fireplace of the master bedroom. A search of the upstairs bedroom revealed a 30–caliber carbine rifle and a loaded handgun, hidden under the mattress.

DEA forensic chemists determined that the brown and white substances inside the jars and containers found in Edwards's residence were heroin and cocaine, respectively. Several other containers also contained lactose, a substance, according to DEA Agents, that is commonly used to "cut" or dilute heroin and cocaine for street sale.

On August 20, 1991, a federal grand jury returned a multi-count indictment against Edwards and fourteen others. Edwards was charged with three counts of conspiring to distribute cocaine and heroin, in violation of 21 U.S.C. § 846; one count of engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848(a); five counts of heroin distribution, two counts of cocaine distribution, and two counts of possession with intent to distribute cocaine, all in violation of 21 U.S.C. § 841(a)(1); one count of using and carrying a firearm in a drug-trafficking crime, in violation of 18 U.S.C. § 924(c); and four counts of using a communication facility to facilitate drug felonies, in violation of 21 U.S.C. § 843(b). Edwards entered a plea of

not guilty and his case was joined for trial with Lynetta Durr and James Davis.[1]

At trial, members, or "employees," of Edwards's drug operation testified as to their involvement as well as to the extent of Edwards's drug trafficking activity. Robert Matthews, named by Edwards as a supplier, testified that he had sold one-ounce and half-ounce quantities of cocaine to Edwards on a number of occasions, beginning in 1990. Brett Guyton and William MacIntosh both testified that for several years they answered the telephone for Edwards, taking orders for heroin and cocaine, until Edwards's arrest in 1990.

Jimmie Edwards testified that he began to assist his brother in the drug conspiracy in 1984, purchasing large orders of heroin from suppliers in Chicago. He stated that the heroin was "cut" or diluted by mixing the pure, supplied drug in a coffee grinder with either lactose or milk sugar. The "cut" product would then be weighed on a triple-beam scale and packaged in $10 quantities in clear plastic bags for sale at the street level.[2]

James Barefield, Flakes Kellum, and Gwendolyn Campbell each testified that they sold drugs for Edwards and received two dollars for each ten-dollar package of heroin sold.[3] During her testimony, Edwards's wife, Lorri Edwards, identified the properties he owned and stated that he had several employees, including Barefield and Kellum, who would take telephone orders and deliver drug packages.[4]

Federal agents testified that the wiretaps revealed a number of drug transactions. Walter Pettigrew, the cooperating individual, was recorded ordering "white lightening," a potent form of heroin. Lynetta Durr, a co-defendant, was recorded ordering $300 of cocaine and a tablespoon of heroin, as well as "eighty girl and twenty boy," code names for cocaine and heroin.

1. The other defendants plead guilty pursuant to plea agreements.

2. Jimmie Edwards recalled the names of several employees of his brother, including Al Moore, Tolly, Cleve, Wesley, Ron, and Plumadora King.

3. Campbell identified the names of others who sold drugs for Edwards, including Lynetta Durr, Al Moore, Deirdre, Cleve, Pookie, Ponderosa, and Plumadora King.

4. Lorri Edwards also identified other sellers employed by Edwards, naming Billy Tendell, Ella Lawrence, Denny, and Ponderosa.

The trial judge, before giving the case to the jury, dismissed one count against Edwards for using a communication facility to facilitate a drug crime, and thereafter the jury convicted the defendant of all remaining counts.[5]

At sentencing, the district court found Edwards responsible for the sale of 47 kilograms of heroin, resulting in an offense level of 42. The court enhanced Edwards's offense level by two levels for obstruction of justice for shooting at federal agents during the search of Edwards's residence at 460 Taft Place. Edwards had a criminal history category of III and was sentenced as follows: life imprisonment for each of the three counts of engaging in a continuing criminal enterprise and conspiring to distribute heroin and cocaine; 240 months' imprisonment for each remaining count of conspiring to distribute cocaine and heroin and distribution of heroin and cocaine; 48 months' imprisonment for using a communication facility to facilitate drug felonies; and 39 months of imprisonment for using a firearm during a drug trafficking offense. The trial court ordered all sentences to be served concurrently with each other, except for the 39 month firearm sentence, but consecutive to any other sentences Edwards may be serving or had been previously imposed.[6] The trial court ordered the 39–month firearm sentence to be served consecutive to all other sentences imposed. The trial judge also ordered a total of $850 in special assessment fees. Edwards appeals his conviction and sentence.

## II. Analysis

### A. Sufficiency of the Evidence

#### 1. Continuing Criminal Enterprise

■ Edwards claims that the evidence presented was insufficient to convict him of engaging in a continuing criminal enterprise. According to the defendant Edwards, a viola-

tion of the continuing criminal enterprise statute requires that the defendant supervise a criminal enterprise that simultaneously employs five or more individuals. Edwards argues that although his drug trafficking ring employed five or more individuals over the course of its ten-year existence, there was no evidence offered at trial that the organization employed five or more persons at any one time.

■ As a threshold matter, Edwards failed to make a motion for judgment of acquittal. During trial, a defendant "who fails to file a timely motion for judgment of acquittal is deemed to have waived on appeal any challenge to the sufficiency of the evidence.... [A]n appellate court may reverse ... only where the defendant demonstrates a manifest miscarriage of justice." *United States v. Caudill,* 915 F.2d 294, 296 (7th Cir.1990) (citations omitted); *United States v. Archambault,* 62 F.3d 995, 998 (7th Cir. 1995). Turning to the statute at issue, a person is engaged in a continuing criminal enterprise if:

(1) he violates any provision of this subchapter or subchapter II of this chapter [Drug Abuse Prevention and Control] the punishment for which is a felony, and

(2) such violation is part of a continuing series of violations of this subchapter or subchapter II of this chapter—

(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

(B) from which such person obtains substantial income or resources.

21 U.S.C. § 848(c). Initially, we note that Edwards's assertion that the government must prove that he supervised five individuals *simultaneously* is incorrect:

---

5. Co-defendants Davis and Durr were also found guilty of the counts charged in their respective indictments. Davis was sentenced and did not appeal; Durr appealed and her conviction and sentence were affirmed. *United States v. Kellum & Durr,* 42 F.3d 1087 (7th Cir.1994).

6. Edwards had plead guilty to assaulting a federal officer, in violation of 18 U.S.C. § 111, and being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). (Cause No. HCR 90–97–1, N.D.Ind.). For these two convictions, Edwards was sentenced to fifty-two months' imprisonment to be followed by three years of supervised release.

The government need not establish that the defendant managed five people at once, that the five acted in concert with each other, that the defendant exercised the same kind of control over each of the five, or even that the defendant had personal contact with each of the five.

*United States v. Bafia*, 949 F.2d 1465, 1471 (7th Cir.1991) (quoting *United States v. Moya–Gomez*, 860 F.2d 706, 746 (7th Cir. 1988)) (quoting *United States v. Possick*, 849 F.2d 332, 335–36 (8th Cir.1988)). *See also United States v. Herrera–Rivera*, 25 F.3d 491, 498 (7th Cir.1994) ("It is not essential that such relationships [between criminal supervisor and employee] have existed at the same moment in time.").[7] We now turn to the standard for evaluating the sufficiency of the evidence supporting Edwards's conviction.

■ On appeal, we consider the evidence in the light most favorable to the government. *United States v. Berchiolly*, 67 F.3d 634, 637 (7th Cir.1995) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). "Unless the evidence is contrary to the laws of nature . . . or is so improbable on its face that no reasonable fact-finder could accept it, we will not reweigh the evidence or evaluate the credibility of witnesses." *United States v. Wilson*, 31 F.3d 510, 514 (7th Cir.1994) (internal quotation omitted). We will reverse "only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt." *Berchiolly*, 67 F.3d at 637 (quoting *United States v. Garcia*, 35 F.3d 1125, 1128 (7th Cir.1994) (quoting *United States v. Gutierrez*, 978 F.2d 1463, 1468–69 (7th Cir.1992))).

The evidence revealed that Jimmy Edwards (the defendant's brother) purchased multiple kilograms of heroin and cocaine for Edwards; Barefield, Kellum, and Campbell testified that they, as well as other individuals, sold $10 bags of drugs for Edwards; and

Guyton and MacIntosh testified that they answered the telephone for the defendant, taking orders for drugs. Recounting the testimony at trial, we note that the witnesses named at least twenty employees of the defendant Edwards. Considering all this evidence, there is no doubt that the jury had ample evidence to convict Edwards of managing a continuing criminal enterprise in concert with five or more persons. *See Berchiolly*, 67 F.3d at 639 ("we very rarely disturb a jury's credibility determination unless it is irrational and unreasonable.").

### 2. Conspiracy to Distribute Narcotics

■ The defendant argues that the evidence at trial demonstrated that he only had a buyer-seller relationship with the drug suppliers Robert Burrell and Robert Matthews, and thus the evidence fell short of supporting a conviction for *conspiring* to distribute the drugs. *See United States v. Townsend*, 924 F.2d 1385, 1394 (7th Cir.1991).

As stated above, "[w]e will reverse a conviction for insufficient evidence only if, after viewing the evidence in the light most favorable to the government, we determine that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Vega*, 72 F.3d 507, 513 (7th Cir.1995) (citing *United States v. Humphrey*, 34 F.3d 551, 555 (7th Cir.1994)). As with his conviction for engaging in a continuing criminal enterprise, Edwards failed to move for a judgment of acquittal at trial, thus we review his conviction only for a "manifest miscarriage of justice." *Archambault*, 62 F.3d at 998, and we will not reweigh the evidence or re-evaluate the credibility of witnesses. *United States v. Dortch*, 5 F.3d 1056, 1065 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1077, 127 L.Ed.2d 394 (1994).

The elements of a conspiracy are well established:

criminal enterprise employ five individuals simultaneously. *See Bafia*, 949 F.2d at 1471–72 (rejecting a defendant's proposal for a jury instruction requiring simultaneous supervision of more than five persons by a defendant charged with operating a continuing criminal enterprise).

---

7. Edwards also argues that the jury instructions as to the continuing criminal enterprise charge were erroneous because they stated that the government "is not required to prove that the defendant managed . . . five or more persons at the same time." This argument fails because there is no statutory requirement that a continuing

A conspiracy is a confederation of two or more persons formed for the purpose of committing, by their joint efforts, a criminal act. To prove that a defendant was a member of a conspiracy, the Government must demonstrate a participatory link between the conspiracy and the defendant. To establish that participatory link, the Government must offer sufficient evidence to demonstrate that the defendant knew of the conspiracy and that he intended to join and associate himself with its criminal design and purpose. When reviewing conspiracy convictions, we must be certain that the Government presented substantial evidence that the defendant was a conspirator. The evidence need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt.

United States v. Pulido, 69 F.3d 192, 206 (7th Cir.1995) (quoting United States v. Campbell, 985 F.2d 341, 344–45 (7th Cir. 1993) (citations omitted)).

■ The government may prove each element of a conspiracy entirely by circumstantial evidence. United States v. Yusufu, 63 F.3d 505, 508 (7th Cir.), cert. denied, — U.S. ——, 116 S.Ct. 578, 133 L.Ed.2d 501 (1995); United States v. Sasson, 62 F.3d 874, 886 (7th Cir.1995) (citing United States v. Vega, 860 F.2d 779, 793 (7th Cir.1988) ("[i]t is perfectly legitimate to prove a conspiracy by circumstantial evidence" because "[b]y its very nature, a conspiracy is conceived and carried out clandestinely, and direct evidence of the crime is rarely available.")), cert. denied, — U.S. ——, 116 S.Ct. 953, 133 L.Ed.2d 876 (1996).

In Edwards's case, count one charged him with conspiring to distribute drugs with Robert Burrell. At trial, FBI Agent Karen Pertuso testified that she interviewed the defendant Edwards shortly after his arrest. According to Agent Pertuso, Edwards stated that he had been dealing heroin and cocaine for some eight years and that one of his sources for heroin was Robert Burrell, also known as "Cuz." FBI Agent Robert Pertuso testified that during an FBI surveillance operation on September 2, 1990 he observed Robert Burrell meet Jimmie Edwards in the parking lot of a Denny's restaurant in Gary, Indiana. The FBI learned of this meeting through wiretaps placed on the telephone line at his residence at 1522 Taft Street in Gary; the Agent observed Burrell and Jimmie Edwards exchange packages.

Jimmie Edwards (who became a cooperating individual with the FBI) testified that Robert Burrell, or "Cuz," was defendant Edwards's source for brown heroin and that he supplied the drug in packages valued at $275 (known as "dips"). Defendant Edwards's wife, Lorri Edwards, corroborated Jimmie Edwards's testimony that the defendant Edwards received "dips" of heroin from an individual named "Cuz." According to Lorri Edwards, defendant Edwards would "beep" Cuz whenever he needed heroin to sell and arrange a meeting at an agreed location.

At trial, the testimony revealed that Edwards and Burrell had an ongoing cooperative relationship to sell heroin. Both the number of transactions and the mutual trust between Edwards and Burrell (Edwards had Burrell's beeper number) reflect more than a straightforward buyer-seller interaction. When taking into consideration the size of Edwards's drug trafficking operation (at least twenty employees were named at trial and over forty-seven kilograms of sold narcotics were identified) and the length of time involved (Edwards admitted that he had been dealing drugs for at least eight years), it was not a manifest miscarriage of justice for the jury to find that Edwards had a cooperative agreement with his heroin supplier, Robert Burrell. See Berchiolly, 67 F.3d at 639 ("we very rarely disturb a jury's credibility determination unless it is irrational and unreasonable.").

In count two, Edwards was charged with conspiring with Robert Matthews to distribute drugs. At trial, FBI Agent Karen Pertuso testified that Edwards admitted to her that Robert Matthews was his cocaine source. Jimmy Edwards testified that Robert Matthews was the source for black tar heroin. Testifying pursuant to a cooperation agreement with the government, Robert Matthews stated that he met the defendant Edwards in 1990 when Edwards was looking for an additional source of cocaine and

agreed to supply drugs to Edwards. According to Matthews, "everything was prearranged" and thus a short telephone conversation, spoken in code,[8] was all that was needed, for Edwards to receive a delivery of narcotics.

The overwhelming evidence was more than sufficient to support Edwards's conviction for conspiring with Robert Matthews to distribute drugs. Edwards admitted that Matthews was one of his narcotics suppliers, and Matthews testified that the terms of sale and delivery were "pre-arranged" to avoid suspicion and increase efficiency. As in the Burrell conviction, given the extensive scope of Edwards's drug ring and Matthews's testimony that he had a "prearranged" agreement to supply Edwards with heroin, there was more than sufficient evidence to conclude that there was no "manifest miscarriage of justice" in the jury's conviction of Edwards for conspiring with Matthews to distribute narcotics. *See United States v. Monroe*, 73 F.3d 129, 132 (7th Cir.1995) (holding that the evidence was sufficient to support defendant's conviction for participating in a conspiracy, and not merely being involved in a buyer-seller interaction, where the relationship between the alleged co-conspirators was ongoing, and defendant had arranged a series of drug transactions for a drug dealer).

**B. Sentencing**

**1. Quantity of Attributable Heroin**

██ Edwards argues that the sentencing court erred in determining that he was responsible for 47 kilograms of heroin. The first of Edwards's contentions is that the district court erred in relying on unreliable, hearsay testimony to determine the total amount of pure heroin that he purchased for distribution. Second, the defendant argues that the sentencing court improperly calculated the weight of diluted heroin that Edwards sold on the street level. We review

the district court's calculation of the quantity of narcotics attributable to Edwards for clear error. *United States v. Taylor*, 72 F.3d 533, 542 (7th Cir.1995); *United States v. Vold*, 66 F.3d 915, 918 (7th Cir.1995). The law regarding the evaluation of evidence supporting sentencing determinations is well settled:

> Information may properly be used in sentencing when it has "sufficient indicia of reliability" to support its probable accuracy. *United States v. Ewers*, 54 F.3d 419, 421 (7th Cir.1995) (citing *United States v. Lueddeke*, 908 F.2d 230, 234 (7th Cir. 1990)). However, this reliability standard "must be rigorously applied." *United States v. Beler*, 20 F.3d 1428, 1432 (7th Cir.1994); *see* U.S.S.G. § 6A1.3(a) ("In resolving any reasonable dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

*United States v. Townsend*, 73 F.3d 747, 751–52 (7th Cir.1996).

At the sentencing hearing, DEA Agent Vincent Balbo testified that he had interviewed two of Edwards's heroin suppliers: Raymond Davis and Abiodun Agbele.[9] According to Balbo, Davis told him that Edwards purchased one to two ounces of "black tar" heroin a week for two years, between 1990 and 1992, paying approximately $6700 per ounce. Davis made a conservative estimate that he had sold Edwards a total of six kilograms of black tar heroin over the course of the two years. Additionally, Davis told Agent Balbo that he sold Edwards 85 grams of "white" heroin.

From the Davis evidence, the sentencing court calculated that 6,035 grams of total sold heroin (six kilograms black tar heroin plus 85

---

8. "This court has frequently acknowledged that drug dealers often use 'code words' in narcotic transactions in an attempt to conceal their criminal conduct." *Kellum*, 42 F.3d at 1090 n. 1. *See also Garcia*, 35 F.3d at 1127 n. 3.

9. Upon his arrest, Edwards had named Davis, Abiodun, Burrell, and Matthews as suppliers of heroin. The DEA arrested Davis and Abiodun, who cooperated with the government in its prosecution of Edwards.

grams white heroin) at 35 percent purity [10] yields 2,130 grams of pure heroin.

Agent Balbo next testified that in October 1991 he interviewed Abiodun Agbele, another source of Edwards's heroin. Abiodun told Agent Balbo that he had sold a total of 463.5 grams of "white" heroin to Edwards in 1989 and early 1990. From the Abiodun evidence the sentencing court calculated that 463.5 grams of total heroin at 50 percent purity [11] yields 232 grams of pure heroin. Thus, the combined pure heroin supplied by Davis and Abiodun amounted to 2,362 grams (232 plus 2,130).

DEA Agent Balbo testified that from his experience in law enforcement, pure heroin is almost always "cut" or diluted before it is sold on the street. In order to calculate the street or retail level purity of Edwards's sales, Agent Balbo summarized the drug purchases made by a cooperating individual, Walter Pettigrew, from Edwards.[12] A DEA lab had analyzed the narcotics purchased by Pettigrew from Edwards and calculated the percent purity of each sample; the majority of the purchases contained less than 5 percent pure heroin, confirming Agent Balbo's testimony regarding the practice of diluting narcotics before street sale.

Applying the street level purity of 5 percent to the 2,362 grams of pure heroin supplied by Davis and Abiodun, the district court calculated street level sales of 47,240 grams of heroin.[13]

Although Edwards argues that the information provided by heroin suppliers Davis and Abiodun is unreliable because they were cooperating witnesses (and hence had a mo-

tive to exaggerate Edwards's purchases to receive more favorable treatment from the government), we observe that their statements were corroborated by other evidence at trial. Jimmie Edwards, Edwards's brother, testified that Davis and Abiodun were two out of defendant Edwards's four sources of heroin. Lorri Edwards, the defendant's wife, also testified that she was aware Abiodun was a regular supplier of heroin. Edwards himself, upon arrest, told the DEA that he had been purchasing ounce quantities of heroin a week from Davis for the previous year-and-a-half. Moreover, the government's calculation was conservative: it ignored the heroin supplied by Matthews and Burrell, two additional sources of narcotics for Edwards.

We conclude that the information relied upon to calculate the total amount of Edwards's drug supply bore "sufficient indicia of reliability." See Taylor, 72 F.3d at 543 (Because the individuals who provided this information gave largely consistent and mutually corroborating accounts, we are not overly concerned that some of these individuals were drug users). United States v. Rose, 12 F.3d 1414, 1425 (7th Cir.1994) ("We cannot expect that witnesses will possess the credibility of people of the cloth, such as rabbis, priests, and nuns...."). Although the quantity of pure heroin supplied by Davis and Abiodun was determined by analyzing the purity of a single sample purchase, "the district court may base its findings as to the quantity of drugs involved in an offense on estimation." Vega, 72 F.3d at 512 (citing

---

10. The 35 percent purity for the Davis heroin was determined as follows: Agent Balbo testified that during the investigation of Edwards, a cooperating individual, working within Edwards's drug ring, had intercepted a weekly drug shipment from Davis to Edwards and forwarded it to the DEA. The DEA laboratory reported that the shipment contained one ounce of 35 percent pure black tar heroin. The 35 percent purity figure was applied to all of Edwards's heroin purchases from Davis.

11. According to Agent Balbo, a cooperating individual under DEA supervision had purchased one ounce of white heroin for $7000 from Abiodun in November 1990. The DEA laboratory determined the heroin to be 50 percent pure.

12. The Pettigrew purchases were: 11.6 grams of 4.7 percent pure heroin for $500 on March 23, 1990; 5.8 grams of 4.8 percent pure heroin and 5.7 grams of 4.7 percent pure heroin for $1000 total on April 23, 1990; 11 grams of 3.0 percent pure heroin on June 11, 1990; 14.1 grams of 1.6 percent pure heroin on September 5, 1990; 85.8 grams of 4.0 percent pure heroin on October 10, 1990; and a special $600 purchase of 1 gram of 47 percent pure heroin also on October 10, 1990.

13. Given that Pettigrew paid $600 for one gram of 47 percent pure heroin, the value of 2,362 grams of pure heroin would be in excess of $3 million.

*United States v. Sturman,* 49 F.3d 1275, 1284 (7th Cir.1995)).

Edwards also asserts that it was clear error for the sentencing court to assume that the 2,362 grams of pure heroin attributable to Edwards was all sold on the street at 5 percent purity (yielding 47,240 grams of total "retail" heroin). Edwards points to the fact that he sold one gram of heroin to Walter Pettigrew, a cooperating individual, that was 47 percent pure heroin. *See United States v. Nobles,* 69 F.3d 172, 191 (7th Cir.1995) ("Judges in the federal system, whether they are in the trial or appellate system, do not operate in a vacuum, shielded from knowledge of drug operations in the real world.") (quoting *United States v. Hatchett,* 31 F.3d 1411, 1420 (7th Cir.1994)).

However, according to the testimony at sentencing, that sale of a single gram was an exception: the DEA lab determined that six other sales to Pettigrew were of heroin in purities of 4.7 percent, 4.8 percent, 4.7 percent, 3.0 percent, 1.6 percent, and 4.0 percent, respectively. Agent Balbo testified that these purity figures confirmed his own knowledge that heroin distributed at the street level is almost always cut to less than 10 percent purity.

Further, according to the information set forth in the DEA wiretaps and the defendant's own admissions, the bulk of Edwards's drug sales were street level and in the form of $10 cut bags of heroin, weighing one tenth of a gram. Edwards's own drug sellers, Barefield, Kellum, and Campbell, testified at trial that Edwards fronted them $10 packages of cut heroin to sell. Thus, the street level purity of 5 percent accurately portrayed Edwards's criminal enterprise. We conclude that the district court did not commit clear error in its determination of the quantity of heroin attributable to Edwards. *See Sasson,* 62 F.3d at 889 (stating that it is rational to penalize a defendant for the combined weight of a drug's active ingredient and the carrier medium because the carrier facilitates distri-

bution and sale of the narcotics); *United States v. Tucker,* 20 F.3d 242 (7th Cir.1994) (defendant accountable for the weight of water and baking soda contained in a cocaine-base mixture).

### 2. Obstruction of Justice

The sentencing court applied a two-level enhancement to Edwards's offense level under U.S.S.G. § 3C1.1 for obstruction of justice, because Edwards had shot at the federal agents when they entered his house to execute the search warrant.[14] Edwards failed to object to the enhancement at sentencing and thus has waived this issue on appeal. *See United States v. Rivero,* 993 F.2d 620, 623 (7th Cir.1993) ("A defendant who fails to raise a sentencing challenge before the sentencing court waives the issue on appeal."). However, we review a waived issue for "plain error." *See* Fed.R.Crim.P. 52(b); *United States v. Olano,* 507 U.S. 725, 735–37, 113 S.Ct. 1770, 1777–78, 123 L.Ed.2d 508 (1993). "A plain error is one that is particularly egregious and seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Soto,* 48 F.3d 1415, 1422 (7th Cir.1995) (internal quotations omitted).

Edwards asserts that because he was convicted of using a firearm during a drug trafficking offense (in violation of 18 U.S.C. § 924(c)), the background commentary to § 2K2.4 of the sentencing guidelines precludes an enhancement for obstruction of justice in his case. The commentary provides:

> Background: 18 U.S.C. §§ 844(h), 924(c), and 929(a) provide mandatory minimum penalties for the conduct proscribed. To avoid double counting, when a sentence under this section is imposed in conjunction with a sentence for an underlying offense, *any specific offense characteristic for explosive or firearm discharge, use, or possession is not applied* in respect to such underlying offense.

**14.** Section 3C1.1 of the guidelines provides:
*Obstructing or Impeding the Administration of Justice*
If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by **2** levels.

Under the above-quoted commentary, Edwards argues, the obstruction of justice enhancement (for shooting at the federal officers) is a "specific offense characteristic for ... firearm" discharge that must not applied to his sentence. We disagree.

As the government points out, an enhancement for obstruction of justice is not a "specific offense characteristic" of an underlying offense, rather it is an adjustment to a defendant's overall offense level to take into account conduct that "willfully obstructed or impeded ... the administration of justice," such as perjury or destruction of evidence. U.S.S.G. § 3C1.1. Because the enhancement is not a "specific offense characteristic" the application note does not apply to Edwards's case and thus there was no plain error in his sentence. *See United States v. Mrazek,* 998 F.2d 453, 454 (7th Cir.1993) (stating that Application Note 2 is unambiguous and must be applied according to its clear terms).

Although the commentary to § 2K2.4 does not govern Edwards's case, Edwards also claims that the obstruction of justice enhancement, for shooting at the agents, constitutes "double jeopardy" for conduct for which he had already been convicted in a prior proceeding: assaulting a federal officer and being a felon in possession of a firearm.

However, the Supreme Court has held that "where the legislature has authorized such a particular punishment range for a given crime, the resulting sentence within that range constitutes punishment only for the offense of conviction for purposes of the double jeopardy inquiry," *Witte v. United States,* —— U.S. ——, ——, 115 S.Ct. 2199, 2208, 132 L.Ed.2d 351 (1995). The "use of evidence of related criminal conduct to enhance a defendant's sentence for a separate crime within the authorized statutory limits does not constitute punishment for that conduct within

the meaning of the Double Jeopardy Clause." *Id.* at ——, 115 S.Ct. at 2206. Thus, we disagree with the defendant-appellant's argument that the obstruction of justice enhancement amounted to a second prosecution or punishment for the same offense, rather it was conduct properly taken into account by the district court to determine the proper sentence with the range proscribed by Congress. *See also United States v. Duarte,* 28 F.3d 47, 48 (7th Cir.1994).

### 3. Double Jeopardy for Engaging in a Continuing Criminal Enterprise

 Edwards was convicted of three individual counts of conspiring to distribute narcotics as well as being convicted of engaging in a continuing criminal enterprise. Edwards received concurrent sentences for these convictions; he now argues that because the conspiracy charged in count 3 is a lesser included offense of the continuing criminal enterprise charge,[15] he is being punished twice for the same conduct.

Edwards's indictment for engaging in a continuing criminal enterprise includes the charge that Edwards conspired to distribute cocaine and heroin as part of a continuing series of criminal acts. Thus, Edwards's separate conviction for conspiring to distribute heroin and cocaine is a lesser included offense of engaging in a continuing criminal enterprise, where that criminal enterprise encompassed the drug conspiracy. *See United States v. Baker,* 905 F.2d 1100, 1103 (1990) (citing *Jeffers v. United States,* 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977)), *cert. denied,* 498 U.S. 904, 111 S.Ct. 270, 112 L.Ed.2d 226 (1990).

The Double Jeopardy Clause of the Fifth Amendment protects defendants from being tried and punished more than once for the

---

15. Count three charged that between January 1986 and October 1990, Edwards conspired with "James Barefield, Pheneather Buchanan, James Davis, Lynetta Durr, Lorri Edwards, Willie Edwards, Jr., Brett Guyton, Flakes Kellum, Ella Lawrence, Willie MacIntosh, Rosetta Pirtle, and Willie Word, defendants herein, [to] knowingly and intentionally distribute and possess with the intent to distribute heroin and cocaine, in violation of 21 U.S.C. § 841(a)(1); 21 U.S.C. § 846."

Count four charged that between January 1986 and October 1990, Edwards engaged in a continuing criminal enterprise by "distributing, possessing with the intent to distribute, and conspiring to distribute heroin and cocaine as part of a continuing series of acts ... which [Edwards] undertook in concert with five or more persons with respect to whom [Edwards] occupied a position of organizer, supervisor, and manager and from which [Edwards] received substantial income and resources."

same offense. It is well established that where a defendant is convicted of conspiring to distribute narcotics, and that conspiracy serves as conduct supporting a conviction for engaging in a continuing criminal enterprise (thus a lesser included offense), there is no double jeopardy violation as long as the defendant does not receive cumulative sentences for the crimes. *United States v. Rutledge*, 40 F.3d 879, 886 (7th Cir.1994), *cert. granted*, —— U.S. ——, 115 S.Ct. 2608, 132 L.Ed.2d 852 (1995); *United States v. Canino*, 949 F.2d 928, 949 (7th Cir.1991) (stating that concurrent sentences may be imposed where a conspiracy conviction is a lesser included offense of a conviction for engaging in a continuing criminal enterprise provided that the punishment does not exceed the maximum under the continuing criminal enterprise act); *United States v. Bond*, 847 F.2d 1233, 1239 (7th Cir.1988) ("a court may impose concurrent sentences for a § 846 conspiracy and the CCE [continuing criminal enterprise] offense."). The reasoning behind the rule is that the act of *agreeing* to distribute narcotics (required for a conspiracy conviction) is distinct from *actually operating* a criminal enterprise that succeeds in distributing large amounts of narcotics. We have stated:

> [O]ne can *both* conspire (agree to run a drug business) and run a continuing criminal enterprise (strike the agreement and succeed).... The two statutes reach the same group of persons. It is not illogical to convict a person of both agreeing to do something (§ 846) and succeeding on a grand scale (§ 848).

*Id.* at 1238. By imposing concurrent sentences for conspiring to distribute narcotics and engaging in a continuing criminal enterprise, the district judge did not impose a cumulative penalty, and the sentence imposed was proper.

### 4. Consecutive Sentences

■ In a prior proceeding, Edwards was sentenced to two concurrent fifty-two month sentences for assaulting a federal officer and being a felon in possession of a firearm. The defendant was serving this fifty-two month sentence at the time the district judge sentenced Edwards for engaging in a continuing criminal enterprise, conspiring to distribute cocaine and heroin, using a communication facility to facilitate a narcotics offense, and using a firearm during a drug felony.

At the sentencing hearing, the district court ordered that the "term of imprisonment imposed by this judgment [life imprisonment] shall run consecutively to the defendant's imprisonment under any previous state or federal sentence." Thus Edwards's life sentence for engaging in a continuing criminal enterprise was imposed to run consecutively to his previously imposed fifty-two month sentence.

At the sentencing hearing, Edwards did not object to the imposition of consecutive sentences and has thus waived the issue on appeal. Thus, our review of the sentence is only for plain error. Fed.R.Crim.P. 52(b); *Olano*, 507 U.S. 725, 735–37, 113 S.Ct. 1770, 1777–78 (plain error must be clear prejudicial and affecting substantial rights); *Soto*, 48 F.3d at 1422 ("plain error" must be particularly egregious and seriously affect the fairness, integrity or public reputation of judicial proceedings).

Initially, Edwards argues that under section 5G1.3(b) of the sentencing guidelines, the district court was required to make his sentence concurrent to the fifty-two month sentence he was currently serving for assaulting federal officers and being a felon in possession of a firearm. Section 5G1.3(b) reads:

> (b) [If] the undischarged term of imprisonment *resulted from offense(s) that have been fully taken into account in the determination of the offense level* for the instant offense, the sentence for the instant offense shall be imposed to run concurrently to the undischarged term of imprisonment.

U.S.S.G. § 5G1.3(b) (emphasis added).

The commentary to the sentencing guidelines explains that subsection (b) "addresses cases in which the conduct resulting in the undischarged term of imprisonment has been fully taken into account under § 1B1.3 (Relevant Conduct) in determining the offense level for the instant offense." U.S.S.G. § 5G1.3, comment. (n.2). The commentary

provides the following example of a situation falling under subsection (b):

> The defendant has been convicted of a federal offense charging the sale of 30 grams of cocaine. Under § 1B1.3 (Relevant Conduct), the defendant is held accountable for the sale of an additional 15 grams of cocaine that is part of the same course of conduct for which the defendant has been convicted and sentenced in state court (the defendant received a nine-month sentence of imprisonment, of which he has served six months at the time of sentencing on the instant federal offense). The guideline range applicable to the defendant is 10–16 months (Chapter Two offense level of 14 for the sale of 45 grams of cocaine; 2–level reduction for acceptance of responsibility; final offense level of 12; Criminal History Category of I). The court determines that a sentence of 13 months provides the appropriate total punishment. Because the defendant has already served six months on the related state charge, a sentence of seven months, imposed to run concurrently with the remainder of the defendant's state sentence, achieves this result.

U.S.S.G. § 5G1.3 comment. (n.2).

We disagree with Edwards that § 5G1.3(b) applies to his case. Section 5G1.3(b) applies where the conduct giving rise to the prior conviction is fully taken into account in sentencing for the instant offense. In *Edwards's* case, the prior convictions were for assaulting a federal officer and being a felon in possession of a firearm. From our review we are convinced that the trial judge, when sentencing Edwards for engaging in a continuing enterprise, enhanced Edwards's sentence only for obstructing justice and did not apply the relevant conduct provision for assaulting federal officers nor for being a felon in possession of a firearm.[16] Thus, subsection (b)'s requirement of concurrent sentences is not applicable to Edwards.

Edwards also argues that if subsection (b) does not apply to his situation, then subsection (c) is the relevant guideline section for determining whether his sentence should be imposed concurrently or consecutively to the remainder of his undischarged fifty-two month sentence (for assaulting federal officers and being a felon in possession of a firearm). According to Edwards, subsection (c) requires that the sentencing court impose a sentence for engaging in a continuing criminal enterprise concurrently to the fifty-two month sentence imposed in the prior proceeding for assaulting a federal officers and being a felon in possession of a firearm. Subsection (c) of 5G1.3 provides that where subsection (b) does not apply (as in Edwards's case) then:

> the sentence for the instant offense [engaging in a continuing criminal enterprise] shall be imposed to run consecutively to the prior undischarged term of imprisonment to the *extent necessary to achieve a reasonable incremental punishment* for the instant offense.

U.S.S.G. § 5G1.3(c), p.s. (emphasis added). Application Note 3 provides the methodology for computing the appropriate sentence under subsection (c):

> To the extent practicable, the court should consider a reasonable incremental penalty to be a sentence for the instant offense that results in a combined sentence of imprisonment that approximates the total punishment that would have been imposed under § 5G1.2 (Sentencing on Multiple Counts of Conviction) had all of the offenses been federal offenses for which sentences were being imposed at the same time.

At the time of Edwards's sentencing for engaging in a criminal enterprise, he was serving a fifty-two month term of imprisonment for assaulting federal officers and being a felon in possession of a firearm. Thus, the guidelines contemplate that the sentencing judge calculate the total sentence that would have been imposed were the assault of feder-

---

16. To the extent that the obstruction of justice enhancement arose from the defendant's assault of federal officers, we note that the enhancement contains an element not found in the assault of officers statute: the defendant must act to *will-* *fully* impede the administration of justice. *Compare* U.S.S.G. § 3C1.1 with 18 U.S.C. § 111. In Edwards's case, he shot at the federal officers to prevent the execution of a lawful search warrant.

al officers and firearm possession convictions being sentenced at the same time as the criminal enterprise conviction. *See United States v. Brassell,* 49 F.3d 274, 278 (7th Cir.1995). *Brassell* further held that the sentencing court in most circumstances should follow the methodology of note 3 in the guidelines commentary. *Brassell,* 49 F.3d at 279 (noting that the district court retains some discretion to abandon the methodology if it does not yield an appropriate incremental punishment).

The government concedes that the sentencing court in Edwards's case did not follow the specific methodology of application note 3 of the commentary to the sentencing guidelines, but argues that the error was harmless and certainly does not rise to the level of "plain error." We agree. Under the sentencing guidelines, Edwards's offense level for engaging in a continuing criminal enterprise was 44, and when combined with his criminal history category of III, results in a sentence of life imprisonment without parole, the maximum term. Thus, even if the district court had, for purposes of calculating a total appropriate punishment, grouped the prior convictions (assaulting a federal officer and being a felon in possession of a firearm) with the instant convictions (engaging in a criminal enterprise, distributing narcotics etc.), the offense level and resulting sentence under the guidelines would remain unchanged: life imprisonment. Therefore, we are convinced that a sentence of life imprisonment results in no prejudicial effect in Edwards's case because a term of life imprisonment without parole remains unaffected whether served consecutively or concurrently to any other sentence.

### III. Conclusion

The convictions and sentences of Lee Edwards are

AFFIRMED.